Okay, we'll go to Teamsters Local 701 versus CBF. Oh, am I wrong? No, that's what we have, that's what I have. Yeah, but... I mean, it came along. I have international brothers of Teamsters. Teamsters. Right, yeah. Yeah. Right, CBF is number three. Why did you... What did I mess up? When we looked at the listing this morning outside the courtroom, it appeared that the McKenna matter was number three. No. Oh. No, I'm sorry, but it's not what's in mine. Not what's in mine. The National Brotherhood's. Yeah. And the Teamsters case is number three. Okay. I played a trick on them. Yeah. Marina, didn't they give the lawyers the same... Oh, I'm sorry, but the third one is International Brotherhood of Teamsters. Right. Yeah. Okay. Outside it appeared it was number three. Right. Okay. Okay. We will return. Okay, we'll look forward to getting you again. According to mine, we should be seeing Mr. Ridley and Mr. Connaughton, right? Yes. Am I pronouncing that wrong? I pronounce it Connaughton, but I'm okay. Connaughton. All right, now you put the accent down. Connaughton. Connaughton. Connaughton. Ridley. Okay. Okay. Good morning, Your Honors. Good morning. My name is John Ridley. I am appearing on behalf of the Appellant CBF Trucking. I would ask respectfully for three minutes to be reserved. Granted. Thank you, Your Honor. May it please the Court. In this case, Michael Mickens, a union driver for CBF Trucking, was obligated to take United States Postal Service mail from one terminal to another. And he didn't. And he didn't. We now know he didn't. And he lied about whether he did first. And he lied about it. And his counsel, now in their appellee's brief at page 14, acknowledged, first, that he never did make the trips, and secondly, that he lied about it. He lied about it not once, but consistently to management. There was a proceeding at which he was represented by union representatives in December of 2008, and he absolutely insisted that he had made his trips. He made all his runs. He was lying. Again, he insisted that the company go get additional information, records, easy pass, postal service records. They did. They decided that they had good cause to terminate him because they knew he was lying. In January, after his termination, there's a grievance proceeding. He is again represented by the union. He again insists. Again, he is lying. The company affirmed its decision to terminate him. That is the decision and that is the issue, and those are the arguments that should have been presented to the arbitrator when the union filed for arbitration. It didn't happen. Instead, Mickens, knowing that he was, as we put it, dead in the water with an arbitrator, if indeed he consistently argued that he had made his runs, decided to change his story. But to do so, he had to engage in what Judge Thompson found to be a fraud because over a period of months from the beginning of the arbitration through the arbitration hearing at the end of July, he hid from CBF tapes that he had secretly made, by the way, against company rules, but that he had secretly made, unbeknownst to his counsel at the hearings, and which tapes definitely showed that he was arguing that he had made his runs. Did you ever ask for those tapes? Yes, Your Honor. We had a parallel proceeding going on in the State Superior Court in New Jersey in which I was counsel. Oh, the arbitration proceeding.  There was, Your Honor. Indeed, counsel argues in his police brief that there is no discovery in the arbitration, but we submitted a supplemental appendix which showed that, in fact, his predecessor counsel had, in writing, demanded all evidence that we were going to rely upon, and we have certified that, indeed, we requested all evidence that they were going to rely upon. How did you request it? By phone call or was it a request in writing? Your Honor, we are not certain, to be honest. The people at CBF who were handling the arbitration internally without outside counsel have not been able to find the letter that they believe was sent to Mr. Porter, then the counsel for Mr. Mickens. But I don't think there's any challenge in the record to the fact that, indeed, there was a demand for mutual discovery, that we provided discovery, and that we did not receive the tapes. Mr. Ridley, I'm willing to accept all your arguments, that you asked for it, that he didn't show it, that he didn't come up with it and all that. I want to tell you a personal story. I don't usually do this. I'm going to tell you a personal story. I've been on this Court for a long time, 32 years. Somewhere around 20-something years ago, I was in an arbitration, and I remember that it was with our then Chief Judge, whom I adored, Judge Seitz. And the company was entitled to fire an employee who had been drinking, and they showed he had been drinking, and they fired him, and the arbitrator said, put him back. And I thought, how can you do something like that? And Judge Seitz wrote the opinion and said, you know, you follow the arbitrator. You might not agree with what the arbitrator did, but that's the arbitration system. And for one reason or another, you just follow. And I always thought that was sort of unfair, but I've come to understand it. Now, here, you don't want us to follow the arbitrator. Well, the district court followed. Judge Thompson followed the arbitrator. Isn't that the whole point of arbitration, whether a court thinks it's unfair, thinks it's wrong, thinks he's not a nice guy, thinks he lied, and all of that? And Judge Thompson said, well, it doesn't go to the essence of the arbitration, so I'm going to follow the arbitrator. Tell us why we shouldn't do that. If arbitrators make bad decisions, and they sometimes do, we can live with that. That's the essence of the collective bargaining process and the grievance process. In other words, if the arbitrator listened to the tapes and still ruled against you, you could live with that. I think we could have, Your Honor. The fact of the matter is it's inconceivable to me that the arbitrator could have listened to the tapes. No, I thought everybody was just saying they do some sort of equity, some sort of magic, maybe voodoo. But they do things, and we tend to follow them. The difference between the experience with the drinking employee is that that – Or the thieving or the lying, whatever else it is. That, I do not know the facts, but it does not appear to me that that was a frustration of the process, of the arbitral process, and then of the judicial process. But in this case, the arbitrator knew that Mickens had given a different story at these earlier meetings. You had the notes that were taken. You impeached his credibility on that basis. The only thing you didn't have were the tapes. That's correct, Your Honor. We acknowledge that we argued at the arbitration that indeed Mickens was lying, and the arbitrator, for whatever reason that is unclear to us, said notwithstanding that he was lying, we're going to reinstate him. They're on a different planet sometimes, but I don't understand. They are. But when a person like Mickens lies in the arbitration proceeding or in the process leading up to that arbitration proceeding and frustrates it, and it is demonstrable that he lied, and he engages in fraud, which is what Judge Thompson found. She found fraud. May I ask you something? All of that was before the arbitrators. How would the tapes have changed anything? Your Honor, I submit respectfully that if the arbitrator had heard the tapes, which reflect Mickens, and as is conceded, by the way, by the union representatives, being surly, being noncommunicative, refusing to even sit down at the grievance proceedings, okay, and then lying flat out about it, okay, the arbitrator couldn't have decided the way he did. But in any event, Your Honor, I submit that the fact of the matter is under 10A1, this Court still has the power to reverse and vacate the arbitration decision. May I ask you something? I'm sorry. I wanted to ask you something about the tapes, Mr. Ridley. Sure. Which is that, as I understand the record, you made numerous requests for all documentation, including tapes. I counted about four separate letters in the civil proceeding. That's correct. I wanted to ask you what that civil proceeding was about, and when did you finally get the tapes? I understand it was after the arbitration. I appreciate it, Judge. Judge, that civil proceeding was a suit by Mickens and several other minority drivers for discrimination. It was pending in the Superior Court. We sought discovery any number of times, as Your Honor has indicated, and Mr. Mickens intentionally held back those tapes in the civil proceeding as well until October of 2009, after the completion of the arbitral proceeding and at a time when he thought that the tapes would be helpful to him in the civil suit that was pending. And it came up during the process of deposition discovery. We said, well, you have tapes. And he acknowledged it, and his counsel then produced tapes to us. That's how we found out, after the arbitration, about the tapes. Your Honor, it seems to me that... We're referencing Section 10A1. Yes. Which requires a court or which allows a court to vacate an arbitration award where the award was procured by corruption, fraud, or undue means. Undue means. So what is the... Do you concede that there has to be a causal relationship between the fraud or the undue means and the award itself? Your Honor, I think that the settled third prong of the fraud test, starting with the Bonar case back in the 11th Circuit in 88, which has been adopted and accepted by numerous circuit courts, is that the fraudulently withheld evidence relates to the material issue of the arbitration. I submit respectfully that Judge Thompson misread the third prong of the fraud test under 10A1. Because she found that there was fraud, but that we weren't applying... I think the materials relate to an issue in the arbitration but not have a causal relationship with the award itself, right? Your Honor, well, first I submit that that is the test, that it must relate to a material issue. And I submit that... But the statute says procured by. Your Honor, I think that you, that we are unable to read the mind of the arbitrator. We have to look at the record. And we know from the record that the fraud, fraudulently withheld evidence, did relate to the material issue that was in the arbitration. Well, your point is that the arbitration award was procured by undue means because the tapes related directly to whether he did or he did not perform what he was supposed to do, which is to pick up the truck. That's correct, Your Honor. And, Your Honor, we submit respectfully that the concept of undue means, which is disjunctive in the statute 10A1, should be considered separately by the court. And we acknowledge that that has not historically been the case. Courts have treated fraud and undue means conjunctively. But clearly, we read them as being disjunctive because the third prong of that test is corruption, which is clearly... The undue means is withholding evidence. Your Honor, the undue means, yes, is and it is withholding evidence. It is lying in the proceedings. But the arbitrator knew that. Excuse me. The arbitrator knew all of that. Judge Thompson said, and I know I'm going beyond the red light. Yes. But I'm entitled. And any of them are entitled to. Judge Thompson said that CBF should have cross-examined Mickens. Did you not cross-examine Mickens? What did she mean by that? Your Honor, there is no record of the arbitration proceeding itself. In-house personnel from CBF were handling the arbitration. And I think we would concede that they brought up the fact that Mickens had previously said that, in fact, he had made his runs. Your Honor, one final thing I would add is that that is what the arbitrator should have been looking at. It's clear he went well beyond that. But we argue the issue of the clock stops. It is such a basic principle of law that the arbitrator should be looking at whether the employer had good cause at the time of the decision to terminate, not whether Mr. Mickens can conjure up a new revised story seven months later and somehow, in some method, finesse the arbitration. That's the unique problem. That's an issue of law that we say demonstrates also the manifest disregard by the arbitrator for the law. Thank you very much. We'll hear you in rebuttal. Thank you. Mr. Hamilton. No, no. You're not Mr. Hamilton. Mr. Connaughton. Am I pronouncing that correctly? Yes, Your Honor. Okay. May it please the Court? Connaughton, yeah. Matthew Connaughton for the appellees. IBT Local 701. You represent the union. That's right, Your Honor. Before I respond to some of the points raised by counsel for the appellant, I'd like to clarify a point that I don't think was entirely grasped by the district court in its opinion, and that is something that You think the district court was wrong? I mean, you're here as the appellee. Of course. The point that I don't think was entirely grasped by the district court was the degree of discovery that takes place in labor arbitration. The district court seemed to accept the employer's position that there's a comparable obligation to produce discovery in labor arbitration as there is in civil litigation or as in a criminal proceeding. And I submit to you that that's simply not the case. Do you think the union gets a free ride? No, of course not. So? But what I do think is that in order to saddle Mr. Mickens and the union in this matter with a duty, an obligation to have produced discovery, specifically these tapes that we're talking about, there had to at the very least have been an informal letter shot off from the employer to Mr. Mickens or union counsel saying we want these materials, which haven't been produced. Are you suggesting to us that Mr. Mickens did in fact or would have in fact produced these, that they weren't requested? I can't read this record and find that. I don't think I'd go so far. But what I will note is that the employer has not produced records of their request. And so you're not conceding that a request had been made? That's exactly correct. They had been made numerous times before the arbitration where had those requests been honored, the tape would have been disclosed. You don't dispute that. I think I'm interpreting your statement as meaning in the state court actions. Yes, sure. Right. It's still a request for discovery and it's specifically referenced recordings. That's right. But it's worth pointing out that in that, that Mr. Mickens' behavior in that separate state court action was dealt with by that court. And as I recall, he was, there was a fine, there was a sanction for that misbehavior. Well, but the thing is, I don't want to read too much into it, but it might have been very convenient for him not to disclose that tape because it went completely contrary to the version he presented in arbitration. I won't dispute that. That's what Mr. Ridley was just saying. So why do I want to yield these tapes? It's going to really ruin my story before the arbitrator. Well, to your point, it's crucial to recognize that the tapes were of the December 08 meeting and the January 09 meeting. These weren't meetings over at the union hall between the business agent and Mr. Mickens. These weren't unions, conversations between Mr. Mickens and the third party. So what? The employer was there. The employer's supervisor, Mr. Finkel, was an attorney. Judge Sloboda just said, so what? I was thinking the same thing. The point is that in those conversations, two separate conversations, he recorded himself saying, I did what I was supposed to do. I left the depot or the area with a trailer, as I was told to do. I believe his statement was, I made all my runs. He lied. There's no question that he lied. Mr. Finkel, the in-house counsel for the employer, prepared minutes of this meeting. It was introduced at the arbitration as Employer Exhibit 13. It's noted in the appendix at page 51, as I recall. Okay, so? So every statement Mr. Mickens made, every inconsistency that was brought up at the arbitration, was memorialized in the employer's own- But you can't defend Mr. Mickens, can you? You're not here defending- I'm not saying we should admire his behavior. I'm not defending his- But his behavior was terrible. I mean, he lied about what he was supposed to do, and he lied about, you know, but the company says, well, he lied and we don't want to take him back, and the arbitrator said, take him back, and the district court said, you know, he lied, and it was fraud, and I agree with all that, but it was a fair arbitration. It was a fair hearing, and so I'm going to follow it because that's the way we do things. You can't defend him. Judge, I think that what the district court said was that because of the arbitrator were noting inconsistent statements by Mr. Mickens, I think what Judge Thompson pointed out was that because the arbitrator recognized and expressly included in his opinion that, yes, there were inconsistencies, and, yes, he had to make a credibility determination, and, yes, maybe he didn't think that Mickens was 100% truth-telling gentleman. You know, the problem with Mr. Connaughton is that it's one thing to note inconsistencies that were brought out by hearsay because it's really the employer saying, we had a hearing before, and this is what he said, but it's quite another thing for the arbitrator to be listening to the tape itself, to be listening to the employee himself on a tape on two separate occasions saying completely different stories, and that's what the arbitrator did not have the opportunity of doing, and that was because he hid the tapes. It's a totally different story. I agree with you that that's what... And the question is, should the arbitrator's decision be, I mean, it's something we don't, I don't remember ever doing it, but I never remember a case like this. One of the questions that is fundamental to the cases that's cited in the appellant's papers is that the general question is, was the party entitled to a fair hearing? By that I mean, and I think the Court's interpreted it as, did the arbitrator have all the information necessary to do so? And if this is a case where the information on those tapes was something that was unknown to the employer, they had no idea about, he made some statements that they realized the first time after the opinion was rendered, it would be a completely different scenario. But, again, as you noted, while the arbitrator didn't have a chance to hear Mr. Micken's voice, didn't have a chance to address the volume or pitch, the statements on those tapes was included in the arbitration. It was included in the... You know, you're taking a different position. I'm sorry? You're taking a much more defensible position than you did at the beginning, when at the beginning you made it sound, to some extent, as if you were defending Mr. Micken. I don't think he's defensible at all. I wouldn't have said to take him back, but the question is, what does the court system do when it's dealing with an arbitration that we think is wrong, but that's still part of the system? And now you're getting to that, and you didn't at the beginning. We didn't miss the shift in your argument. Well, I just had a different order of my items than you have. Why shouldn't it be viewed as a corruption of the arbitration system, of the judicial system? I'll go back to my first point that I know Judge didn't care for, which was that search the case law, search the NLMB regulations, search the rules and governing policies of the New Jersey State Board of Mediation. There's nowhere where it will say a party to the arbitration has an affirmative obligation to unilaterally produce discovery before it's requested. There's a state statute in New Jersey that permits a party to arbitration to issue a subpoena in the name of the arbitrator. There's no doubt that it was requested. My point is, he withheld it, knowingly withheld it, and the question is, isn't that a corruption of the arbitration system? I submit to you it's not, and to your earlier statement, I don't accept that it was requested in the context of this arbitration. It doesn't matter, though, because the district judge, Judge Thompson, made a finding that there was fraud on the part of Mr. Mickens. I think you have to accept that finding. Now, the question is, in my mind at least, what does that mean? Does it mean that the award itself had to be procured by fraud or undue means, and is there enough evidence that it was procured by those means? Or is it simply enough that it related to a material issue? Obviously, his credibility is a material issue. Materially relate to an issue in the arbitration. The pivotal question of the arbitration was, was there just cause to discharge Mr. Mickens? It's a heavy burden the employer has to carry because that's how it is stated in the collective bargaining agreements all over New Jersey and in this case as well. The two points you raised, Judge, about was there corruption or fraud or undue means, and also did the information on the tapes involve a material issue? Because the information on the tapes was memorialized in the minutes, was discussed at the arbitration, and there was no new information. There was nothing unknown to the employer that came out through these tapes. Whenever they emerged, I think that answers the question. Is Judge Thompson aware of the existence of the tapes at any time? I apologize. I'm not able to answer that, Judge. Well, Judge Thompson knew about the tapes. That was the whole issue before, right? I'm sorry, yes. Are the tapes part of the record before us? I'm sorry, I can't answer that either. I expect Mr. Ridley will discuss that. Okay, thank you. Thank you, that's all. You have nothing more to say. Okay, do you have any questions? I have no other questions. You mentioned, I think, what you referred to as the decision that the employer has made at the time that the employer discharges an employee, and that's what we should look at. Is that what you said? I think that you're thinking of the council's discussion of the clock stops rule, but because you raised the point, I'll address it in tow. The clock stops rule, if such a rule does exist in New Jersey, which I don't concede that it does, and I think that the party's papers demonstrate that lack of rules applicability in New Jersey, but the rule itself would, as you mentioned and as the point counsel noted. It suggests that the arbitrator looks at the employer's decision at the time that it is made. Right, and if we freeze the, you know, suspend reality and freeze the clock and look at when they decided to discharge Mr. Mickens, what did they know? Well, they knew exactly what Mr. Mickens had said at these two meetings. They knew the demeanor he had in the room as surly or inappropriate as the employer contends it was, but they knew what he said. They knew what he claimed he had done and hadn't done. And so even if the clock stops rule applies, which, again, I'll leave it to the court, but there's nothing new that came after the clock stopped other than hearing his voice itself, as you noted. And do we know, now I have a follow-up question, do we know whether at the arbitration hearing itself the employer argued the clock stops doctrine or even raised the issue to highlight it for the arbitrator? I can't answer the question either way. Do you think it's fair for Mr. Mickens to receive back pay for a period in which he also received unemployment compensation? I do think it's fair, but what I will... Well, in other words, he's getting paid twice for the same period, isn't he? What I'll defer to is in our papers when we describe the discretion given to arbitrators of fashion, a remedy, and in doing so, the arbitrators of this matter made a decision on that. I think the record also reflects, as does Judge Thompson's opinion, that evidence of the unemployment insurance compensation received, it didn't appear to the district court that it was discussed at the arbitration and so it wasn't clear whether it was even part of the record. So on that, it's a cloudy area. But think about it from a different perspective. Mr. Mickens has a legal obligation to reimburse unemployment. That's... Oh, he does? If he receives back pay for a period that he received unemployment. That's his problem, I guess. Right, and typically how it's done is he'll take care of it on his own. The union doesn't make him do that? Not that I've ever seen, but because it's his responsibility. They're not overseeing him and making sure he's secure. Finish the sentence. So it's your position that there doesn't have to be a causal relationship between his failure to produce the tapes and the arbitral decision. I wouldn't go so far, Your Honor. What I would perhaps reword your statement and say that there does need to be a causal relationship between whatever conduct is alleged and whatever the result was. Put differently... Boy, that's very vague. Do you want to be a little more specific? Sure, sure. In order to find... Let's assume for just a moment that there was fraud and that there was... Well, the district court said there was fraud. I mean, we have to accept it. I'm not prepared to reverse her on that. Let's assume that there's fraud, and what was the result? What did this fraud produce, what I'm saying? The fraud produced a situation where, as the judge noted, the arbitrator didn't get to hear Mr. Mickens' voice. That's the only substantive limitation, only difference, the only result from what the fraud cost was. There couldn't be a huge difference. It's like presenting to a jury hearsay testimony or presenting to the jury the actual testimony of the person whose credibility the jury has to assess. I would submit that the meat of what's on those tapes is the facts. It's the statements that, as the arbitrator noted, were inconsistent statements. And the arbitrator made the credibility determination and also noted, in his opinion, that the lack of substantial non-hearsay testimony from the employer is something that he based his opinion on. In other words, the arbitrator knew that at the time of the hearing, at the time of these meetings, he gave one story and now was given a different story at the time of the hearing itself. That's precisely correct. I see my time is up. Yes. Thank you. Saved by the red light. Thank you. Your Honor, Judge Fuentes, I think, hit the nail on the head when you spoke about the corruption of the arbitral system. If ever there was a case that cries out for correction because of the attempt, successful to date, to corrupt the arbitral system, this is it. This is a man who flat out lied at the time when it was critical that he tell the truth because the employer was making the decision in December and January of 2008-2009 as to whether it had good cause. It should not then be submarined seven months later at an arbitration proceeding by Mickens for the first time coming up with a new story and, at the same time, hiding evidence, refusing to produce evidence that would have completely undermined his new story. That's what happened here. And you have hundreds of truck drivers at this company who are unionized drivers who are aware of this proceeding. Mr. Mickens was in the civil litigation then. He's in new civil litigation now after his reinstatement. He has laughed at this company and at the arbitral and judicial system. We don't know that. That's speculation. Your Honor, for him to come into the arbitration and to change the story seven months after he had given it twice. He lied. We all accept the fact that he lied. Judge Thompson, the arbitrator, accepted the fact that his credibility was zilch. Judge Thompson accepted that. And they still upheld the arbitral's award. And I submit respectfully that Judge Thompson made an error of law when she, in essence, said that the third prong of the fraud test for vacation of an arbitral decision under 10A1 is a but-for test. I submit respectfully that it is not a but-for test, that the test is whether he fraudulently withheld evidence which related to the material issue of the arbitration. That's the test, and I submit respectfully that if you apply that test, this decision has to be vacated. I think that test comes from that language procured by you. Your Honor, that test has been accepted by any number of circuits over the years. There are other circuits that have also said there has to be a causal relationship between the fraud and the award itself. And, Your Honor, I think that the language of that test is the appropriate language. I think that for the courts to be looking back at an arbitration proceeding to determine whether it's but-for is extraordinarily difficult when there are no records made at the entire arbitration proceeding and the like. I think that test should be applied here. I think, too, that the separate disjunctive undue means section of 10A1 should be applied. And that test has been stated to be behavior that is immoral, if not illegal. And this is immoral behavior. Mr. Ridley, I didn't notice anything in the briefs, but do you know of an arbitration award that has been vacated on the facts similar to this case? Your Honor, we did not. We searched and were not able to find any that was vacated. What I would note in that regard, though, is that Justice Alito in the Stolt-Nielsen decision at footnote three made what I thought was a very interesting comment with respect to the manifest disregard issue. And he said in that case that with respect to the decision of the arbitrators in Stolt-Nielsen, the language that he used was, in essence, that it would be sufficient, that the facts in Stolt-Nielsen would be sufficient to show manifest disregard by the arbitrators when they determined that the interpretation of the contract in Stolt-Nielsen was such that they could order class arbitration. I think that if you apply the Stolt-Nielsen, if you first find that Hall did not deprive the court of determining manifest disregard as a basis for a vacation of an arbitration award, if you. You read my this one. I'm sorry, Your Honor. Thank you. Thank you very much. Thank you.